**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAFAYETTE DIVISION**

| | |
|---|---|
| ORAY BREAUX, JR., MICHAEL CAMERON | CIVIL ACTION NO. 14-2265 (LEAD), 14-2268 (MEMBER) |
| VERSUS | JUDGE S. MAURICE HICKS, JR. |
| ROSEMONT REALTY ET AL | MAGISTRATE JUDGE HANNA |

**MEMORANDUM RULING**

Before the Court is a Motion for Summary Judgment filed that the Defendants in the above captioned matter, Rosemont Realty ("Rosemont"), Jack Stahl Company, LLC ("Jack Stahl"), South Point Operating Associates, LP ("South Point"), and Cheryl Willoughby ("Willoughby"). See Record Document 75. Plaintiffs, Oray Breaux, Jr. ("Breaux") and Michael Cameron ("Cameron") oppose the motion. See Record Document 98. Upon due consideration of the parties' submissions and the applicable law, Defendants' motion is hereby **GRANTED**.

**FACTUAL AND PROCEDRUAL BACKGROUND**

**I.      Procedural Background**

Breaux and Cameron (collectively "Plaintiffs") are former maintenance technicians at South Point Apartments in Lafayette, Louisiana. Each filed separate petitions with the 15th Judicial District Court, Lafayette Parish, which were subsequently removed to federal court. Thereafter, the cases were consolidated because the petitions contain nearly identical claims against the same Defendants. See Record Document 54. During the course of the litigation several of Plaintiffs' claims have been

dismissed pursuant to Rule 12(b)(6).[1]  The remaining claims are: (1) age discrimination under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, et seq.; (2) retaliation under the Louisiana Environmental Whistleblower Act ("LEWA"), La. Rev. Stat. 30:2027; (3) breach of duty to provide a safe work place pursuant to La. Rev. Stat. 23:13; and (4) damages caused by ruin of building per La. Civ. Code art. 2322. Defendants have now filed a Rule 56 dispositive motion seeking the dismissal of all of Plaintiffs' remaining claims.  See Record Document 75.

## II.     Factual Background

### A.      South Point Business Structure

It is clear from the filings that the parties do not agree as to which of the named Defendants are properly considered Plaintiffs' employer.  Plaintiffs initially asserted that Rosemont was their employer. See Record Document 1 at ¶ 2A; No. 14-2268 Record Document 1 at ¶ 2A.  Breaux later testified that he believed Jack Stahl was his employer because in his opinion Jack Stahl managed the property, but he also stated that his paycheck was issued by South Point. See Record Document 98-2 (Breaux Dep.) at 175, 296.  Breaux also testified that he believed Rosemont was his employer because they offered him a 401(k) retirement plan. Id. at 295.  In response to Defendants' argument herein that some of Plaintiffs' claims are precluded under the

---

[1] Plaintiffs also asserted claims for (1) violations of the Clean Air Act, 42 U.S.C. § 7401 et seq.; (2) breach of the general duty clause of the Occupational Safety Health Administration; (3) violations of the Louisiana Department of Environmental Quality regulations; and (4) violations of the Louisiana Whistleblower's Act, La. Rev. Stat. 23:967, which were dismissed with prejudice. See Record Document 30 and 40; 14-cv-2268 Record Document 32 and 54.  Plaintiffs' claims against Willoughby for violations of the ADEA and the Louisiana Environmental Whistleblower Act were also dismissed with prejudice. Id.  Plaintiffs also listed Betsy Primeaux as a Defendant, but all claims against her were dismissed under Local Rule 41.3 for failure to serve.  See Record Document 33; 14-cv-2268, Record Document 50.

Workers' Compensation Act, Plaintiffs now argue that there is insufficient evidence in the record to properly establish that any of the named Defendants were Plaintiffs' employers. <u>See</u> Record Document 98 at 13-15. This is an interesting assertion given that in the same filing Plaintiffs also argue that South Point, Rosemont, and Jack Stahl are all liable as Plaintiffs' employers for alleged violations of LEWA and the ADEA. <u>See</u> <u>id.</u> at 24-30. Defendants respond by conceding for summary judgment purposes that Rosemont, Jack Stahl, and South Point were all collectively Plaintiffs' employers. <u>See</u> Record Document 101 at 5.

Regardless of Defendants' concession, the evidence in the record demonstrates that Plaintiffs' employer was South Point, although all three entities were involved with the apartment complex in some manner. Defendant Willoughby, Executive Vice President for South Point, testified that South Point was Plaintiffs' employer. <u>See</u> Record Document 98-8 (Willoughby Dep.) at 21, 39-40, 120. South Point owned and operated the apartment complex as a limited partnership, with Rosemont as its general partner. <u>Id.</u> at 46.[2] South Point issued paychecks to all employees and provided health benefits. <u>Id.</u> at 122. Willoughby also testified that South Point hired Jack Stahl as a consultant to handle clerical items such as payroll, purchasing orders, tenant applications, and background checks of job applicants. <u>Id.</u> at 18-21, 30, 43-44. Rosemont did offer South Point employees the opportunity to participate in their 401(k) retirement plan. <u>Id.</u> at 121. South Point provided any matching contributions. <u>Id.</u> at 123.

---

[2] Rosemont acquired the majority shares of BGK stock in 2010. <u>See</u> Record Document 98-8 at 12-14. Prior to this transaction, BGK was the general partner of South Point. <u>Id.</u> at 20. BGK was not named as a Defendant in this matter.

## B. Relevant Personnel

The corporate offices of South Point, Rosemont, and Jack Stahl are located in New Mexico. Id. at 14-15, 22. Willoughby is also located in New Mexico. Id. at 8. Rusty Lober ("Lober"), general manager of Jack Stahl, frequently visited the South Point property in Lafayette and would report his findings to Willoughby. Id. at 27. Cam Perron ("Perron"), property administrator for Jack Stahl, performed various administrative tasks for South Point. Id. at 27. Perron also communicated regularly with Willoughby. Id.

South Point also had a local manager on site in Lafayette who reported to Willoughby. During the events relevant to this matter, Melanie Boswell ("Boswell") was the local manager until she was replaced by Kerri Primeaux. Shortly after Kerri Primeaux was hired, Willoughby asked Betsy Primeaux, a local manager of another Rosemont property, to assist at South Point because Kerri Primeaux was having issues with her employees and she was new to the property. Id. at 33-34, 38.[3] Cameron reported to Boswell during his tenure at South Point. Due to Breaux's long tenure, he reported to a series of local managers, ending with Kerri Primeaux.

## C. Michael Cameron

On April 24, 2012, Cameron was hired at the age of 55 to be a maintenance technician at South Point. See Record Document 75-7 (Statement of Uncontested Facts) at ¶ 1. When hired, Cameron was a certified mechanic in heating, ventilation, and air-conditioning ("HVAC") systems. Id. at ¶ 4. Cameron's primary responsibilities at South Point included addressing work orders, servicing and repairing air-conditioning units, and tending to other maintenance issues at the complex. Id. at ¶ 5. Cameron was

---

[3] Kerri Primeaux and Betsy Primeaux are not related to each other. See Record Document 98-8 at 63.

also responsible for "make readies," which required him to make all necessary repairs to a vacated apartment to ensure it was "ready" for a new tenant. Id. at ¶ 12.

Cameron alleges that the residents of South Point frequently reported air conditioning leaks as well as the presence of mold in their apartments. See No. 14-2268, Record Document 1 at ¶ 6. Cameron states that he was required to work in direct contact with mold when he cleaned the AC units. Id. at ¶ 6. Cameron testified that there was often mold in the AC drain pans and drain lines. See Record Documents 98-5 (Cameron Dep.) at 191. Although the mold was never tested, it was Cameron's opinion that based on his HVAC training that some of the mold at South Point was "black mold," which he descried as "the worst kind of mold." Id. at 245. Cameron testified that he made requests for OSHA compliant masks to wear while cleaning the AC units, but South Point did not approve the expense. Id. at 176-177, 202. Cameron also testified that mold was present in the individual apartments, noting that he saw mold around doors and windows, bathtubs, toilets, underneath bathroom floors, in the carpet, and also along the walls and ceilings. Id. at 178, 257-258. Cameron claims that management told him not to discuss mold with the tenants. Id. at 192-193.

Cameron alleges that tenants at South Point experienced health problems including flu-like symptoms, allergies, skin rashes, and coughing. See No. 14-2268, Record Document 1 at ¶ 7; Record Documents 98-10, 98-11, 98-12 (affidavits of South Point tenants). Cameron claims that he began experiencing similar symptoms as well as swelling in his throat and upper lip, shortness of breath, numbness in his hands and feet, and skin rashes. Record Document 98-5 at 177; No. 14-2268, Record Document 1 at ¶ 8. Cameron also went to the emergency room with symptoms of vertigo, a rash,

and edema, which Cameron attributes to mold exposure. <u>See</u> Record Document 98-5 at 169-171. In 2016, Cameron sought treatment from a physician familiar with mold exposure who informed him that his symptoms were consistent with mold exposure. <u>Id.</u> at 165-167. The doctor performed tests, but did not find evidence of mold in Cameron's body due to the lapse in time from his alleged exposure. <u>Id.</u> at 167.

Cameron alleges that he repeatedly reported mold issues as well as alleged environmental violations to Boswell, local manager of South Point during his tenure. <u>See</u> No. 14-2268 Record Document 1 at ¶ 12; Record Document 98-5 at 188; Record Document 98-6 at 204-206, 215-220. Cameron claims that he also reported the mold issues to Lober, general manager of Jack Stahl, when Lober was in town checking on the property. Record Document 98-6 at 206; Record Document 98-8 at 26-27. Cameron also claims that he reported EPA and OSHA violations concerning the manner in which Freon from the AC units was handled at South Point. Record Document 98-6 at 215-218. Specifically, Cameron alleges that South Point did not have a proper system for Freon recovery, and instead would let it escape into the atmosphere. <u>Id.</u> He also claims that he reported to management that South Point was not keeping proper records regarding Freon as required by the EPA and OSHA. <u>Id.</u> Cameron states that he brought this matter to the attention of management on numerous occasions, including Lober and Perron. <u>Id.</u>; Record Document 98-8 at 27.

Cameron was terminated on April 30, 2013, at the age of 56. <u>See</u> Record Document 75-7 at ¶ 17. Cameron believes that he was terminated due to a combination of his age and the medical problems he was experiencing, which caused him to miss work. Record Document 98-5 at 175, 180-181. Cameron states that

Boswell told him that he was being terminated because the company considered him a liability because of his medical illness. Record Document 75-2 at 99.[4]  Cameron alleges that his termination was in violation of the ADEA because given his age, his immune system could not cope as well with the unsafe working conditions at South Point. <u>See</u> No. 14-2268 Record Document 1 at ¶ 28.[5]  Cameron also claims that on one occasion while hauling items out of an upstairs apartment a fellow maintenance technician said "come on Grandpa…. we ain't got all day…. come on old man" in front of Boswell.  <u>See</u> Record Document 75 at 101. Cameron also testified that he believes he was terminated due to his age because of the general manner in which the staff was treated at South Point.  <u>See</u> Record Document 98-5 at 171.  Cameron testified that an emphasis was placed on age, noting that the bookkeeper was called "Grandma Moses" and was criticized for the length of time required to complete certain tasks.  <u>Id.</u> at 172.  Finally, Cameron alleges that he was replaced by someone much younger and less qualified, although the individual in question was hired a few weeks before his termination.  <u>See</u> No. 14-2268, Record Document 1 at ¶ 27; Record Document 75-2 at 147. Cameron claims that the individual was hired because Defendants were already considering terminating his employment. Defendants contend that Cameron was terminated due to performance and attendance issues.  <u>See</u> Record Document 75-3, Ex. 1, Perron Declaration.

---

[4]  Boswell testified that she terminated Cameron's employment, but she could not recall telling him the reason for his termination.  <u>See</u> Record Document 98-8 at 79-80.

[5]  Cameron did not make a claim for disability discrimination with the EEOC.  <u>See</u> Record Document 98-6 at 222.

### D. Oray Breaux, Jr.

On September 5, 2006, at the age of 49, Breaux began working for South Point as a maintenance technician. Record Document 75-7 at ¶¶ 36, 37. Breaux's duties included routine repair tasks, performing HVAC repairs, and responding to "on call" maintenance requests. Record Document 1 at ¶ 4. Breaux also cleaned air-conditioning units as part of the process to "make ready" apartments for new tenants. Record Document 75-7 ¶ 43. Breaux further described his duties as "anything and everything," working where he was needed. Record Document 98-2 at 58. Breaux became HVAC certified in May 2013, and shortly thereafter received a raise of $2.00 per hour. Record Document 75-7 at ¶ 44-45.

Breaux alleges that he was required to work in direct contact with mold when he cleaned the AC units. See Record Document 1 at ¶ 7. The cleaning process required Breaux to cut the AC unit out of the building and move it outside to be cleaned with acid. See Record Document 98-2 at 56-57. Breaux testified that he also came into contact with mold while performing carpentry work, such as sheetrock repair. Id. at 191. Breaux alleges that South Point's tenants frequently report air conditioning leaks and the presence of mold in their apartments. See Record Document 1 at ¶ at 5. Breaux also claims that South Point had a policy not to discuss any issues dealing with mold in front of tenants. Record Document 98-2 at 185-187. Breaux also testified that he was told not to put anything about mold in writing. Id. at 83.

Breaux also claims that tenants complained of flu-like symptoms, coughing, and allergies while living at South Point. See Record Document 1 at ¶ at 5; Record Documents 98-10, 98-11, 98-12 (affidavits of former South Point tenants). Breaux

claims that he also began experiencing symptoms similar to the tenants. <u>See</u> Record Document 1 at ¶ 8. Breaux alleges that he sought emergency medical treatment for his symptoms on numerous occasions. <u>Id.</u> at ¶ 9. Breaux testified that he has resting tremors, sinus issues, and problems remembering things, all of which he attributes to his exposure to mold at South Point. Record Document 98-2 at 235, 236. Breaux also sought treatment from a physician familiar with mold exposure who told him that he had symptoms consistent with mold exposure, although her testing did not reveal any evidence of mold in his system. <u>Id.</u> at 274-276.

Breaux asserts that he notified every South Point manager during his employment of the mold issues at the complex. <u>Id.</u> at 199. He reported the issues because he believed there was a serious problem because tenants were getting sick. <u>Id.</u> at 179-180. Breaux also testified that he became aware that South Point was possibly violating environmental regulations when he was getting his HVAC certificate. <u>Id.</u> at 201-205. Specifically, he stated that he learned it was a violation to clean the AC coils on the curb because the acid used in cleaning would go into the drainage system. <u>Id.</u> at 208-209. He stated that he informed Betsy Primeaux, an area manager over South Point and another location, but she responded by acting as if she "didn't want to hear it." <u>Id.</u> at 208-209. Breaux also testified that the return air units inside the apartments did not have drainage pans, which allowed any leaks from the AC unit to fall directly on the floor beneath. <u>Id.</u> at 203-204.

Breaux was terminated on July 26, 2013, at the age of 56. <u>See</u> Record Document 75-7 at ¶¶ 63, 64. Breaux alleges that he was terminated in response to his reporting of possible environmental violations to Betsy Primeaux. Record Document 1

at ¶ 27. He also alleges that his termination was based on age discrimination in violation of the ADEA. Id. at ¶ 33. Breaux claims that he was replaced by 26-year old Bryan Koatcska ("Koatcska"). Id. at ¶ 36. Breaux testified that Koatcska was hired before his termination, but that Koatcska told him that he was hired as his replacement. Record Document 98-2 at 76-77.

Breaux also alleges that Betsy Primeaux made a comment that "anyone over 29 is useless" to a group of people, but looked at him and smiled. Id. at 72. Breaux believes based on the manner in which Betsy Primeaux was looking at him that the comment was directed towards him. Id. at 72-74, 86. Breaux also states that Betsy Primeaux referred to him as "papa hen," which he interpreted as a negative comment based on the way she looked at him. Id. at 100. However, Breaux never complained to anyone about this, or any other negative comment. Record Document 75-7 at ¶ 50.

Breaux also claims that Kerri Primeaux, South Point manager at the time of his termination, treated him differently because of his age by giving him slow assignments that "an old man could do" while giving harder assignments to less experienced crew members. Record Document 98-2 at 80-81. Breaux also claims that Kerri Primeaux began talking to him as if he had Alzheimer's disease by frequently repeating things. Id. at 80-81.

Defendants maintain that Breaux was terminated for insubordination. See Record Document 75-1 at 16. On July 19, 2013, Breaux was issued a disciplinary action report ("DAR") by Kerri Primeaux and Betsy Primeaux. See Record Document 75-4, Ex. 11. The DAR listed seven enumerated reasons why Breaux was written-up, including: (1) not following instructions and proper work schedule given by superior; (2)

withholding important information regarding the well-being of the property; (3) not cooperating and getting along with coworkers; (4) using work time to discuss useless non-work related and personal issues; (5) insubordination; (6) quality of work; and (7) quantity of work. Id.

Breaux responded several days later by sending a letter to Perron in which he offered a rebuttal to each alleged insufficiency noted in the DAR. See Record Document 75-4, Ex. 12. The most inflammatory being his response to allegations 6 and 7 regarding his quality and quantity of work, in which he responded as follows:

> Perplexing given Ms. Betsy's [Primeaux] previous statements made in the presence of others that I was a "really together person" who was "an asset to the company." So what is it? Is my work good or have we "worked stupid" over the past two years?

> Cam, I would suggest that this questionable action is based upon personal judgment, self serving interests, and borderline stupidity on Ms. Betsy's part. As to the matter of "numerous verbal warnings and discussions," when did these occur and where are they? Maybe these are the result of Ms. Betsy's personal judgments. I on the other hand, demand proof! If my work at South Point during my past seven years was stupid then indeed everyone's work (including yours!) was "stupid" as well.

> Let's get this issue straightened out asap. As always Cam I am depending on you to set the wrong right! If there are any questions, you may have please contact me immediately. This is intolerable to me and all concerned.

Id. Breaux faxed the letter to Perron on July 26, 2013. Breaux dep. 137, 139-140. He was terminated that same day at the age of 56. Id.

## LAW AND ANALYSIS

**I.    Summary Judgment Standard** [6]

Summary judgment is proper pursuant to Rule 56 of the Federal Rules of Civil Procedure when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Quality Infusion Care, Inc. v. Health Care Serv. Corp., 628 F.3d 725, 728 (5th Cir. 2010). "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the nonmoving party." See id. "Rule 56(a) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Patrick v. Ridge, 394 F.3d 311, 315 (5th Cir. 2004). If the movant demonstrates the absence of a genuine dispute of material fact, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." Gen. Universal Sys., Inc. v. Lee, 379 F.3d 131, 141 (5th Cir. 2004). A nonmovant cannot meet the burden of proving that a genuine issue of material fact exists by providing only "some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a

---

[6] Defendants argue that Plaintiffs failed to sufficiently respond to their statement of uncontested facts, and therefore, all of their factual contentions should be deemed admitted. See Record Document 101 at 3 (citing Chesapeake v. Innovative Wellsite Systems, Inc., No. 12-2963, 2014 WL 5796794, at *1 (W.D. La. Nov. 6, 2014)). The non-movant in Chesapeake provided general statements of contested issues of facts, but did not specifically controvert the movant's statement of uncontested material facts. See Chesapeake, No. 12-2963, Record Document 154-1. Plaintiffs in this case provided a direct response to 75 of the 83 enumerated uncontested material facts. See Record Document 98-1. Plaintiffs failed to address items 65, 66, 67, 78, 79, 80, 81, and 82, which are hereby deemed admitted pursuant to Local Rule 56.2. See id.

scintilla of evidence." Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994). Where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, then summary judgment should be granted. See Boudreaux v. Swift Transp. Co., 402 F.3d 536, 540 (5th Cir. 2005).

## II.    Age Discrimination Claim

The ADEA makes it unlawful for an employer to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of age. See 29 U.S.C. § 623(a). The ADEA does not authorize a mixed-motive analysis of an age discrimination claim. Rather, a plaintiff must prove by either direct or circumstantial evidence that age was the "but-for" cause of the alleged adverse employment action. Gross v. FBL Financial Services, Inc., 557 U.S. 167, 176 (2009) (citations omitted). It is insufficient for a plaintiff to show that age was a motivating factor. Id. at 175. A "but-for" cause is one that without which the challenged adverse employment action would not have occurred. Leal v. McHugh, 731 F.3d 405, 415 (5th Cir. 2013) (citation omitted).

Without direct evidence of discrimination, such as in this case, a plaintiff's circumstantial evidence is analyzed under the familiar framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Jackson v. Cal-Western Packing Corp., 602 F.3d 374, 378 (5th Cir. 2010) (applying McDonnell Douglas to ADEA case). To establish a prima facie case of an ADEA claim, a plaintiff must show that "(1) he was discharged; (2) he was qualified for the position; (3) he was within the protected class at the time of discharge; and (4) he was either (i) replaced by someone outside the protected class, (ii) replaced by someone younger, or (iii) otherwise

discharged because of his age." <u>Kilgore v. Brookeland Indep. School Dist.</u>, 538 F. App'x 473, 475-76 (5th Cir. 2013). A plaintiff may prove that he was "otherwise discharged because of his age" by establishing that a comparable employee benefited from disparate treatment under "nearly identical" circumstances. <u>Kim v. Hospira, Inc.</u>, 709 F. App'x 287, 289 (5th Cir. 2018).

If a plaintiff sets forth a prima facie case of age discrimination, then the employer must articulate a legitimate, non-discriminatory reason for the employee's discharge. <u>See</u> <u>Kilgore</u>, 538 F. App'x at 476. The burden is one of production, not persuasion. <u>See</u> <u>St. Mary's Honor Center v. Hicks</u>, 509 U.S. 502, 509 (1993). The plaintiff must then be provided the opportunity to rebut the employer's purported explanation to show that the reason given is merely pretextual. <u>Moss v. BMC Software, Inc.</u>, 610 F.3d 917, 922 (5th Cir. 2010) (citation omitted). To determine whether a plaintiff's rebuttal evidence precludes summary judgment the court must decide whether a plaintiff has shown that there is a genuine dispute of material fact as to whether the proffered reason is pretextual. <u>Id.</u> Pretext is shown via "evidence of disparate treatment or by a showing that the employer's proffered explanation is false or unworthy of credence. <u>Id.</u> (quoting <u>Laxton v. Gap Inc.</u>, 333 F.3d 572, 578 (5th Cir. 2003)). A plaintiff must present enough competent summary judgment evidence to raise a genuine issue of fact. A mere scintilla of evidence of pretext is not enough. <u>See</u> <u>Anderson v. Tupelo Regional Airport Auth.,</u> 568 F. App'x. 287, 290 (5th Cir. 2014).

Cameron argues that he has established a prima facie case of age discrimination. <u>See</u> Record Document 98 at 28. The record demonstrates that Cameron was qualified for the position of maintenance technician. Record Document

98-3 at 26; Record Document 75-7 at ¶ 4.  Cameron was within the protected class, age 56, and he was discharged.  Record Document 98-4 at 69; Record Document 75-7 at ¶ 17.  However, Cameron cannot establish the fourth prong of his prima facie case because the employee he identified as his replacement, Anthony Trahan ("Trahan"), was hired before Cameron's termination.  See Record Document 75 at 144-148.  It is Cameron's belief that Trahan was hired to replace him because "things were going on that they were considering terminating me for."  Id. at 147.  Cameron's subjective speculation is insufficient to establish that he was replaced by a significantly younger individual.  See Kim, 709 F.3d App'x at 288.

Cameron has also failed to provide competent summary judgment evidence to demonstrate that he was "otherwise discharged because of age" by establishing that a comparable employee benefited from disparate treatment under "nearly identical" circumstances. See id. at 289.  Cameron was asked during his deposition whether he believed other employees were treated better than him or were given preferential treatment, to which be responded: "Generally, I would say no. I would say that, you know, I didn't think I—I—they were given preferential treatment. There were certain instances of people who would work that, you know, noticeably had it easier than other people. You know, they weren't assigned, like, dirty jobs and stuff like that."  Record Document 75-2 at 115.  This testimony is insufficient to establish disparate treatment because a comparator has not been identified.

Cameron also testified that his work was scrutinized by both Breaux and Jeremy Sons ("Sons"), maintenance supervisor at South Point.  Id. at 121.  Sons was Cameron's immediate supervisor, but Cameron testified that Sons scrutinized his work

because he thought Cameron was "out for his job. He wasn't making it easy for me, you know." Id. Cameron testified that Breaux also scrutinized his work to see how he handled certain situations. Id. When asked whether he believed either Sons or Breaux had an issue with his age Cameron replied: "no, I don't think so." Id. This testimony is insufficient both because it does not identify a comparator and because there is no evidence of discriminatory animus.

Cameron did provide evidence of alleged comments by an unidentified maintenance technician who referred to him as "grandpa" and "old man." Record Document 75-2 at 101-102. However, remarks made by co-workers without authority or influence over the employment decision are insufficient to defeat summary judgment of his claim for wrongful termination under the ADEA. See Reed v. Neopost USA, Inc., 701 F.3d 434, 441 (5th Cir. 2012) (citing Russell v. McKinney Hosp. Venture, 235 F.3d 219, 226 (5th Cir. 2000)). Accordingly, this Court finds that Cameron has failed to establish a prima facie case.

Even if the Court were to find that Cameron has met his prima facie case, Defendants have offered legitimate non-discriminatory reasons for his termination; frequent absences and serious performance issues. See Record Document 75-1 at 15. Perron provided an affidavit detailing Cameron's employment issues as follows: (1) on multiple occasions Cameron indicated that he had completed a "make ready," but his supervisors determined that additional work was required; (2) frequently refused to show up for after-hour calls when he was on-call; (3) after being asked by the manager to fix a botched repair, Cameron passed the assignment to another maintenance technician. See Record Document 75-3 (Perron affidavit). Cameron has offered no

additional evidence to suggest that Defendants' proffered reason is false or unworthy of credence. There is simply insufficient evidence to establish or even suggest that Cameron's age was the "but-for" cause of his termination. Therefore, Cameron's ADEA claim is hereby dismissed.

Breaux also argues that he has established a prima facie case of discrimination. See Record Document 98 at 28. The record demonstrates that Breaux was qualified for the position of maintenance technician. Record Document 98-2 at 18. Breaux was within the protected class, age 56, and he was discharged. Record Document 75-7 ¶ 64. However, Breaux has not established that he was replaced by someone younger, or outside the protected class, with competent summary judgment evidence. Breaux alleges that Koateska was hired to replace him, even though Koateska was hired before his termination. Record Document 1 at ¶ 23; Record Document 98-2 at 76. Breaux stated in his deposition that Koateska told him that he was hired to replace him, and that Koateska learned of this information directly from Willoughby. Record Document 98-2 at 76-77. Defendants argue that Breaux's account of what Koateska allegedly stated regarding his employment is rank hearsay and should not be considered competent summary judgment evidence. Record Document 75-1 at 11 (citing Fowler v. Smith, 68 F.3d 124, 126 (5th Cir. 1995)). Breaux did not respond to this objection in his opposition brief. The alleged statement by Koateska is hearsay evidence because Breaux offers the statement for the truth for which it is asserted. See FRE 801(c). Accordingly, this statement cannot be considered for purposes of this motion.

Breaux has also failed to provide competent summary judgment evidence to demonstrate that he was "otherwise discharged because of his age" by establishing that

a comparable employee benefited from disparate treatment under "nearly identical" circumstances. See Kim, 709 F. App'x at 289.  Breaux testified that Betsy Primeaux treated him differently than the other maintenance technicians by placing unnecessary restrictions upon him, such as telling him not to talk to the other technicians while the other technicians could talk to each other.  Record Document 98-2 at 78.   Breaux also testified that Kerri Primeaux treated him differently by assigning him tasks suitable for an "old man" by giving him assignments that were slow while giving harder assignments to the other technicians.  Id. at 81. Breaux also testified that Kerri Primeaux treated him as if he had "Alzheimer's or something" by repeating herself to him. Id. at 81-82. Breaux believed Betsy Primeaux and Kerri Primeaux were "trying to make me quit I think, because the treatment didn't match the behavior." Id. at 87.  These allegations do not identify a comparator, nor do they offer a comparison under "nearly identical" circumstances.

Breaux also alleges that Betsy Primeaux made a comment about his age by allegedly stating "anyone over 29 is useless" to a group of people, but looked at him and smiled.  Id. at 72. Breaux believes based on the manner in which Betsy Primeaux looked at him that the comment was directed towards him.  Id. at 72-74, 86.  However, Breaux later admitted that his EEOC charge described Betsy Primeaux having uttered the comment in the context of describing her romantic relationship with a man who was 29.  Id. at 145. Breaux stated in his deposition that this comment was made "a week or so" before his termination.  Id. at 85.  Breaux also states that Betsy Primeaux referred to him as "papa hen," which he interpreted as a negative comment based on the way she looked at him.  Id. at 100.   When asked if there were any other comments Breaux

responded by stating, "I'll say it this way. For me to come to the conclusion I did there was a lot that had to have been said at the time." Id. at 85. When asked for additional examples Breaux could not remember any other comments. Id.

As noted above, comments may support an inference of discrimination for a plaintiff's circumstantial case of discrimination when the comments show: "(1) discriminatory animus, (2) on the part of a person that is either primarily responsible for the challenged employment action or by a person with influence or leverage over the relevant decision-maker." Goudeau v. National Oilwell Varco, L.P., 793 F.3d 470, 475-76 (5th Cir. 2015) (comment by supervisor "there sure are a lot of old farts around here" and saying plaintiff wore "old man clothes" sufficient to meet standard). Betsy Primeaux did have leverage over South Point's manager. However, neither of the comments made by Betsy Primeaux are sufficient to support an inference of discrimination because they do not reflect discriminatory animus based on age. The "papa hen" comment is derived from the concept of "mother hen" which is defined as "a person who assumes an overly protective maternal attitude." Webster's New Collegiate Dictionary 774 (9th ed. 1989). Plaintiff testified that Betsy Primeaux chastised him for "caring too much" about the property, and for supervising the other maintenance technicians. Record Document 98-2 at 100, 209. This court does not interpret the comment as being derogatory of Breaux's age, but of his self-assigned role to oversee the quality of work within the maintenance department. Likewise, Betsy Primeaux's 29-year old comment appears to be comment about the men she prefers to date, not a statement demonstrating discriminatory animus regarding Breaux's age as it relates to his

employment. Accordingly, Breaux has not established a prima facie case of age discrimination.

However, even if a prima facie case were established Defendants have offered a legitimate non-discriminatory reason for Breaux's termination: Breaux's insubordination in his letter addressed to Perron wherein he suggested that Betsy Primeaux was "stupid." Record Document 75-1 at 16. Defendants offered the following uncontested material facts, which Breaux failed to controvert: (1) When asked in his deposition if he believed he was terminated because of the letter, he responded "[y]es, I did. I was told I got fired because of the letter, and that came from Betsy [Primeaux];" (2) Mr. Breaux continued, "[Betsy] told me that once Cheryl [Willoughby] read it Cheryl got pissed off and Cheryl said I had to go, her exact words. And that if she didn't do it that Cheryl would come down and fire her and me;" (3) Ms. Primeaux told Mr. Breaux that if he "wouldn't have wrote that letter she said I'd still be there." Record Document 75-7 at ¶¶ 65, 66, 67 (citing Record Document 98-2 at 139,143). Willoughby testified that Breaux was issued the DAR as a courtesy due to his long tenure at South Point, but when she read his response letter she decided to immediately terminate him for insubordination. See Record Document 98-8 at 60-61, 69. Because Breaux failed to controvert Defendants' uncontested facts regarding his termination, he cannot establish that Defendants' proffered reason for his termination is false or unworthy of credence. Further, there is insufficient evidence in the record to establish that Breaux's age was the "but-for" cause of his termination. Accordingly, Breaux's ADEA claim is hereby dismissed.

### III.     Breach of Duty to Provide Safe Workplace

Plaintiffs Cameron and Breaux have asserted claims against Defendants pursuant to La. Rev. Stat. 23:13 for an alleged breach of duty to provide a safe workplace.  Specifically, both Cameron and Breaux have alleged that they were required to work in hazardous conditions, and Defendants failed to implement necessary safeguards and safety procedures to protect them from harm. <u>See</u> Record Document 1 at ¶ 56; No. 14-2268 Record Document 1 at ¶ 47.  Defendants argue that this claim is barred because the Louisiana Workers' Compensation Act is the exclusive remedy for claims related to the Plaintiffs' employment.  Record Document 75-1 at 25. Plaintiffs argue that Workers' Compensation is inapplicable because a genuine issue of material fact remains as to which Defendants were Plaintiffs' employers.  Record Document 98 at 13-14.  However, as discussed above, there is sufficient evidence in the record to support a finding that South Point was Plaintiffs' employer.

The Louisiana statute establishing an employers' duty to provide a safe workplace provides, in pertinent part, as follows:

> Every employer shall furnish employment which shall be reasonably safe for the employees therein.  They shall furnish and use safety devices and safeguards, shall adopt and use methods and processes reasonably adequate to render such employment and the place of employment safe in accordance with the accepted and approved practice in such or similar industry or places of employment considering the normal hazard of such employment, and shall do every other thing reasonably necessary to protect the life, health, safety, and welfare of such employees.

La. Rev. Stat. 23:13.  This statute provides a negligence-based claim, which requires the court to consider a duty-risk analysis.  <u>Diaz v. Superior Energy Services, LLC</u>, No. 07-2805, 2008 WL 3077071 at *9 (E.D. La. Aug. 4, 2008). One of the critical elements a plaintiff must establish by a preponderance of the evidence is that a duty of care was

owed.  Id. The plain language of the statute states that it is directed to "every employer."

La. Rev. Stat. 23:13.  Because this Court has determined that Jack Stahl, Rosemont,

and Willoughby were not Plaintiffs' employers, none owed a duty to Plaintiffs under this

statute. See Palermo v. Port of New Orleans, 04-1804 (La. App. 4 Cir. 2007), 951 So.2d

425, 435.[7]  Accordingly, Plaintiffs' claims against Jack Stahl, Rosemont, and Willoughby

for breach of duty to provide a safe workplace must be dismissed.

The Louisiana Workers' Compensation statute provides that an employer is

responsible for compensation benefits to an employee who receives a personal injury

by accident arising out of and in the scope and course of his employment. La. Rev. Stat.

23:1031(A).   An employer is also responsible for every employee who is disabled

because of the contraction of an occupational disease arising out of and in the course of

his employment.  La. Rev. Stat. 23:1031.1(A).  An occupational disease is defined as a

"disease or illness which is due to causes and conditions characteristic of and peculiar

to the particular trade, occupation, process, or employment in which the employee is

exposed to such disease."  La. Rev. Stat. 23:1031.1(B).

In general, Workers' Compensation is the exclusive remedy for an employee's

work-related injuries, and precludes civil liability except for injuries resulting from

intentional acts.  See La. Rev. Stat. 23:1032.[8]  As this Court noted in prior rulings in this

---

[7]  Alternatively, as General Partner of South Point, the exclusive remedy provision is
also extended to Rosemont.  See La. Rev. Stat. 23:1032 (A)(1)(a) and (b).

[8]  The only exception set forth within the Workers' Compensation Act is for liability
resulting from an intentional act, which is narrowly interpreted.  See Broussard v. Smith,
2008-473 (La. App.3 Cir. 12/3/08), 999 So.2d 1171, 1174.  The "intent" required in the
Workers' Compensation scheme means that the defendant "consciously desired to
bring about the physical result of his act or believed it was substantially certain to follow
from his conduct."   Jasmin v. HNV Cent. Riverfront Corp., 94-1497 (La. App. 4 Cir.

case, there are two Louisiana cases in which employees were allowed to proceed with a tort claim pursuant to La. Rev. Stat. 23:13 against their employer for injuries associated with mold exposure. See Record Document 30 at 3-4 (citing Ruffin v. Poland Enterprises, LLC, 06-0244 (La. App. 4 Cir. 12/13/06), 946 So.2d 695, writ denied 07-0314, 954 So.2d 163; Watters v. Department of Social Services, 08-977 (La. App. 4th Cir. 2009), 15 So.3d 1128. However, this case is distinguishable from both Ruffin and Watters.

The plaintiffs in Ruffin were clerical staff who claimed they experienced illnesses and injuries due to mold exposure while working for the Louisiana Department of Social Services. Ruffin, 946 So.2d at 696. The Ruffin court held that the plaintiffs were not subject to the Workers' Compensation exclusive remedy provision because the type of injury they experienced would be non-compensable under the Act. Id. at 700. In reaching this decision the court noted that La. Rev. Stat. 23:1301 only provides compensation for two classifications of injuries: (1) an accident, or (2) an occupational disease or illness "due to causes and conditions characteristic of and peculiar to the particular trade, occupation, process, or employment in which the employee is exposed." Id. at 698-99 (citing La. Rev. Stat. 23:1031(A) and La. Rev. Stat. 23:1031.1). The court noted that repeated mold exposure was not an "accident" because the exposure did not "happen suddenly or "violently." Ruffin, 946 So.2d at 699. The court also found that the plaintiffs' injuries were not an occupational disease, noting that it could find no basis to a support a reasonable explanation as to why exposure to mold would be "characteristic of and peculiar to clerical work." Id. at 700. Having found that

8/30/94), 642 So.2d 311, 312 (citation omitted). A defendant's grossly negligent conduct is insufficient on its own to establish intent. Id. at 313. (citation omitted).

the plaintiffs' injuries were not compensable under the Act, the tort claim was allowed to proceed. Id. The facts of Watters are similar to those of Ruffin. See Watters, 15 So.3d 1128. In Watters, a class action was brought on behalf of all state employees who worked in the Plaza Tower in New Orleans and were exposed to mold. Id. at 1134. For the reasons cited in Ruffin, the class was allowed to pursue its tort claim against their employer. Id. at 1141.

The Plaintiffs in this case allege injuries consistent with an occupational disease as defined by La. Rev. Stat. 23:1031.1(B). Plaintiffs were hired as maintenance technicians, whose primary job duties included servicing and repairing HVAC systems. Record Document 1 at ¶ 4; No. 14-2268 Record Document 1 at ¶ 4. Plaintiffs were also required to perform necessary repairs inside the apartment units. Record Document 98-4 at 60-61; Record Document 98-2 at 191. As part of their duties, Plaintiffs cleaned the AC units when requested to do so, and during the cleaning process Plaintiffs came into direct contact with mold. Record Document 1 at ¶ 7; No. 14-2268 Record Document 1 at ¶ 6. Cameron testified that when he cleaned the AC units he would see mold in the AC units, including the condenser, evaporator, and drain pans. Record Document 98-5 at 178, 191-193. Breaux testified that he was required to clean the AC coils to stop mold from growing. Record Document 98-2 at 39. Breaux also testified that he came into contact with mold when he was required to do sheetrock work. Id. at 190. Cameron testified that mold was also present in the apartment units around windows, bathtubs, toilets, and under the linoleum floors. Record Document 98-5 at 178. Breaux testified to the presence of mold in the subfloors and ceilings of the apartments. Record Document 98-2 at 183. Breaux testified that the maintenance crew received work

orders about water leaks on a daily basis, and orders related to mold once or twice a week.  Id. at 184.  Cameron also testified that the maintenance crew received work orders regarding mold in apartment units.  Record Document 98-5 at 179.

As maintenance technicians, both Cameron and Breaux encountered mold as a routine matter when cleaning the AC units, responding to work orders, and preparing apartments for new tenants.  The Plaintiffs' exposure to mold in this context is consistent with and characteristic of their duties as maintenance technicians at South Point.  Moreover, their alleged injuries occurred during the course and scope of their employment as maintenance technicians.  Plaintiffs argue that the mold they encountered at South Point is consistent with the amount and degree encountered by a mold remediator, not a maintenance technician, such that any exposure should not be considered an occupational disease.  See Record Document 98 at 18.  As support, Plaintiffs cite the testimony of Willoughby in which she agreed that if she had received information that a repair involved mold remediation she would have authorized the hiring of a specialist.  See Record Document 98-8 at 117-118.

This Court does not view the degree of the mold encountered to be dispositive on this issue.  Even if the Court were to assume that all of Plaintiffs' allegations are indeed true and South Point's facilities contained excessive mold, there is no right to relief under La. Rev. Stat. 23:13.  Plaintiffs allege that they encountered mold during the course of performing their work duties.  Any injury or illness resulting therefrom is squarely within the realm of Workers' Compensation. Plaintiffs' sole remedy is to file a claim for Workers' Compensation. Accordingly, Plaintiffs' La. Rev. Stat. 23:13 claims against South Point are dismissed.

## IV.     Ruin of Building Claim

Plaintiffs also assert a claim for damages caused by ruin of a building pursuant to Louisiana Civ. Code art. 2322, which provides that "[t]he owner of a building is answerable for the damage occasioned by its ruin, when this is caused by neglect to repair it, or when it is the result of a vice or defect in its original construction."  A plaintiff must prove the following elements to hold the owner of a building liable for damages: (1) ownership of the building; (2) the owner knew or, in the exercise of reasonable care, should have known of the ruin or defect; (3) the damage could have been prevented by the exercise of reasonable care; (4) the defendant failed to exercise such reasonable care; (5) causation, and (6) the ruinous building created and unreasonable risk of harm. Broussard v. State ex rel Office of State Buildings, 12-1238 (La. 2013), 113 So.3d 175, 182-83 (citations omitted).

The evidence in the record demonstrates that South Point owned the apartment complex in question.  Willoughby testified that South Point purchased the apartment complex in 1999 or 2000. See Record Document 98-8 at 19-20.  Because La. Civ. Code art. 2322 is only applicable to building owners, Plaintiffs' claims against Jack Stahl and Cheryl Willoughby must be dismissed.  Plaintiffs' claims against South Point and Rosemont must also be dismissed for the reasons explained above in relation to Plaintiffs' claim for breach of duty to provide a safe working environment. If an employee is injured as a result of a defective condition of a building owned or operated by the employer, the employee's exclusive remedy for relief is found within the Workers' Compensation Act. See Claudio v. Silla Cooling Systems, 10-52 (La. App. 5 Cir. 12/14/10), 55 So.3d 902, 908.

## V. Louisiana Environmental Whistleblower Claim

The Plaintiffs have also asserted claims pursuant to the Louisiana Environmental Whistleblower Act ("LEWA"), La. Rev. Stat. 30:2027. The LEWA provides in pertinent part as follows:

> A. No firm, business, private or public corporation, partnership, individual employer, or federal, state, or local governmental agency shall act in a retaliatory manner against an employee, acting in good faith, who does any of the following:
>
> (1) Discloses, or threatens to disclose, to a supervisor or to a public body an activity, policy, practice of the employer, or another employer with whom there is a business relationship, that the employee reasonably believes is in violation of an environmental law, rule, or regulation.
>
> (2) Provides information to, or testifies before any public body conducting an investigation, hearing, or inquiry into any environmental violation by the employer, or another employer with whom there is a business relationship, of an environmental law, rule, or regulation.

La. Rev. Stat. 30:2027.

The purpose of LEWA is to protect employees from retaliatory or adverse employment action by employers for reporting possible environmental violations. Collins v. State ex rel. Dept. of Natural Resources, 2012-1031 (La. App. 1 Cir. 5/30/13), 118 So.3d 43, 49.[9] An employee is not required to know specifically which law is being violated as long as the employee acts in good faith and reasonably believes there is a violation. Id. "The term 'good faith' as used in R.S. 30:2027, means an employee is acting with an honest belief that a violation of an environmental law, rule, or regulation has occurred." Borcik v. Crosby Tugs, LLC, 858 F.3d 936, 937 (5th Cir. 2017).

---

[9] La. Rev. Stat. 30:2027 only applies to employers. Accordingly, Plaintiffs' claim against Jack Stahl, Rosemont, and Willoughby are dismissed.

The five elements required for a cause of action under LEWA are as follows: (1) employee acts in good faith; (2) employee reports, or threatens to report a violation; (3) employee reasonably believes the activity, policy, or practice undertaken by his employer, or another employer with whom there is a business relationship with his employer, is a violation of an environmental law; (4) employee reports or threatens to report the violation to a supervisor or to a public body of the employer; and (5) employer acts in retaliatory manner because the employee reported or threatened to report a violation. Collins v. Louisiana, 118 So.3d at 49.

When no direct evidence of retaliation is present, the claim is analyzed under the familiar McDonnell Douglas burden-shifting framework. Guillot v. Walgreen Louisiana, Inc., No. 07-430, 2008 WL 1744717, at *5 (W.D. La. Apr. 16, 2008). To establish a prima facie case of retaliation, a plaintiff must show: (1) he engaged in activity protected by statute; (2) he suffered an adverse employment action; and (3) a causal connection existed between the protected activity and the adverse action. Id. (citing Smith v. AT&T Solutions, Inc., 90 F. App'x 718, 723 (5th Cir. 1994). Establishing causation at the prima facie stage is not onerous because the plaintiff is not required to meet the more stringent 'but for' causation standard. Walter v. BP America, Inc., No. 12-0177, 2014 WL 1796676 *20 (E.D. La. May 6, 2014) (citing Manning v. Chevron Chem. Co., 332 F.3d 874, 833 n. 6 (5th Cir. 2003)). If plaintiff is successful the burden shifts to the employer to provide a legitimate, non-retaliatory reason for the adverse employment action. Walter, 2014 WL 1796676 *20 (citation omitted). The employer's burden is merely one of production, not persuasion, requiring no credibility assessment. Id. (citation omitted). If the defendant presents such evidence, "the fact-finder must then decide whether

retaliation was the but-for cause for the employer's action." Id. at * 25.   The plaintiff

must provide proof that the unlawful retaliation "would not have occurred in the absence

of the alleged wrongful action or actions of the employer." Id. (citing Univ. of Texas

Southwestern Medical Center v. Nassar, 570 U.S. 338, 360 (2013)).

Both Plaintiffs experienced an adverse employment action (termination), leaving

only the issues of protected activity and a causal connection to be established to meet

their prima facie case.   Defendants argue that Plaintiffs cannot establish that they

engaged in protected activity as required by LEWA because they were required to

inform their employer about the presence of mold as part of their normal job

responsibilities. See Record Document 75-1 at 20-21 (citing Stone v. Entergy Services,

Inc., 2008-0651 (La. App. 4th Cir. 2009), 9 So.3d 193, writ denied, 6 So.3d 797 (La.

2009); English v. Wood Group PSN, Inc., 15-568, 2015 WL 5061164 (E.D. La. Aug. 25,

2015)).   The Stone court stated: "while we find no Louisiana case directly on point, we

further hold that the [LEWA] does not afford protection to an employee who generates

reports regarding environmental issues when reporting environmental issues, concerns,

and potential violations is part of one's normal job responsibilities, and part and parcel

of what one is hired and/or required to do."   See Stone, 9 So.3d at 200.   Read in

isolation, this language would seem to support Defendants' argument.   However, the

facts surrounding the plaintiffs in both Stone and English are distinguishable from

Plaintiffs in this case. The plaintiff in Stone worked as an environmental analyst for

Entergy. Id. at 196.   Part of his job responsibilities included reporting environmental

violations or concerns to his supervisors.   Id. at 200.   The plaintiff in English worked as

an electronics instrumentation technician on an offshore oil platform.   English, at *1.

One of his "primary duties was to inspect the platform VK-823 and complete monthly compliance reports for the Bureau of Safety and Environmental Enforcement, United States Department of the Interior []." Id.

Plaintiffs in this case were maintenance technicians charged with HVAC repairs and other maintenance tasks throughout the apartment complex. Plaintiffs testified that they frequently reported the presence of mold to the apartment manager. Record Document 98-2 at 199; Record Document 98-6 at 204-206. However, Plaintiffs were not employed as environmental specialists, nor were they tasked with completing a monthly environmental report to submit to a federal agency. They simply informed management about the presence of mold. To conclude that the reporting of environmental issues was part and parcel of Plaintiffs' responsibilities as maintenance technicians based on the Stone case is a bridge too far in the opinion of this Court.

The evidence in the record supports a finding that Plaintiffs engaged in protected activity. Breaux and Cameron both testified that they reported their concerns regarding the release of spent Freon from AC units into the open air, as well as regulations requiring Freon to be captured and stored. See Record Document 98-6 at 215-218; Record Document 98-7 at 274-275; Record Document 98-2 at 284-285, 308-309. Cameron testified that he expressed his concerns to the apartment manager and to Lober. Record Document 98-7 at 274-275. Breaux testified that he put all of his concerns regarding Freon in writing and submitted it to Boswell. Record Document 98-2 at 308-309. Breaux also testified that he complained to Betsy Primeaux about the process of cleaning the AC coils with acid on the curb because the fluid would go down the storm drains, which Breaux considered an environmental violation. Id. at 208-209.

There is also evidence in the record to support a finding that Plaintiffs engaged in protected activity with respect to their repeated reports concerning excessive mold. Cameron was knowledgeable about mold, having learned about the different types of mold and applicable regulations during his HVAC training. Record Document 98-3 at 31. Breaux also learned about mold while taking a class to become HVAC "clean air" certified. Record Document 98-2 at 21. Plaintiffs' deposition testimony demonstrates that they were clearly very concerned about the presence of mold within the apartments and the AC units at South Point and expressed this information to their local manager on numerous occasions. Cameron stated that after seeing excessive mold in an apartment where people were getting sick, he told Boswell about the type of mold present as well as the proper procedure to have it properly removed. Record Document 98-6 at 207-210. Cameron also testified that he took Lober through some of the apartments to show him the excessive mold issues. Record Document 98-7 at 276. Cameron testified that he suggested, based on information from OSHA, that South Point purchase a dehumidifier to thoroughly dry carpet after a water leak. Record Document 98-5 at 182, 188-189. Cameron also testified that he repeatedly asked management to provide proper OSHA compliant respirators to wear while cleaning the AC units, but none were provided. Record Document 98-5 at 175-176, Record Document 98-6 at 202, 206, 218. Breaux testified that he reported the presence of excessive mold to every on-site manager he worked for during his tenure. Record Document 98-2 at 199. Breaux stated that he believed the mold was a serious problem because the tenants were getting sick and management knew about it. Id. at 179-180. This is sufficient to establish that Plaintiffs reported issues to management in good faith.

See <u>Brown v. Catalyst Recovery of Louisiana, Inc.</u>, 2001-1370 (La. App.3 Cir. 4/3/02), 813 So.2d 1156 (reports of OSHA violations protected under LEWA).

Having found that Plaintiffs engaged in protected activity, the Court must next determine whether Plaintiffs have established that a causal connection exists between their protected activity and termination. "Temporal proximity between the protected activity and adverse employment can prove the causation element when the protected act and the adverse employment action are very close in time." <u>Vargas v. McHugh</u>, 630 F. App'x. 213, 216 (5th Cir. 2015) (quoting <u>Washburn v. Harvey</u>, 504 F.3d 505, 511 (5th Cir. 2007)). Plaintiffs may also show a causal connection by producing other evidence of retaliation, such as evidence that a plaintiff's employment record does not support the employer's action, or where an employer has departed from their typical policies or procedures. <u>Vargas</u>, 630 F. App'x at 217 (citing <u>Feist v. Louisiana Dept. of Justice</u>, 730 F.3d 450, 454-55 (5th Cir. 2013)).

Breaux testified that he was terminated "not long" after he reported violations regarding the AC systems and the handling of Freon, which he testified was within the months prior to his termination. Record Document 98-2 at 286. Breaux also testified that Boswell, his prior manager, told him that he was becoming a liability because he was asking about the mold. <u>Id.</u> at 182. However, during this same time period Breaux received a pay raise, even after reporting his concerns. <u>Id.</u> at 199. Significantly, Breaux also testified that he repeatedly reported issues regarding mold during his seven-year tenure without an adverse employment action. <u>Id.</u> at 305-306. Breaux also argues that Boswell did not perceive the contents of the DAR to be legitimate based on her experience as Breaux's manager. <u>Id.</u> at 78. However, Boswell was not the manager of

South Point when Breaux was terminated, and she testified that she did not actually see the contents of the DAR.  <u>See</u> Record Document 98-9 at 77-78.

There is no evidence of temporal connection between Cameron's complaints and his termination. Like Breaux, Cameron also reported violations to management throughout his tenure with South Point.  He stated that he requested OSHA compliant respirators and reported Freon issues immediately after he was hired.   Record Document 98-6 at 218, 220.  There is simply insufficient evidence to establish a causal connection between the Plaintiffs' protected activity and their termination.  As such, this Court finds that Plaintiffs have failed to establish a prima facie case for violations of LEWA.

Even if a prima facie case were established, Defendants offered legitimate non-discriminatory reasons for Plaintiffs' termination.   As previously discussed herein, Defendants assert that Cameron was terminated for frequent absences and serious performance issues. <u>See</u> Record Document 75-1 at 15; 75-3.  Defendants assert that Breaux was terminated for insubordination in direct response to his letter regarding the DAR in which he suggested that Betsy Primeaux was "stupid."   <u>Id.</u> at 16.   The uncontested facts surrounding Breaux's termination stand as uncontroverted.

The burden is shifted back to the Plaintiffs to provide sufficient evidence to suggest that their protected activity was the "but-for cause" of their termination.  <u>Walter</u>, 2014 WL 1796676 at *25.   To avoid summary judgment, Plaintiffs "must show a 'conflict in substantial evidence' on the question of whether the employer would not have taken the action 'but-for' the protected activity." <u>Id.</u> (quoting <u>Coleman v. Jason Pharm.</u>, 540 F. App'x 302, 304 (5th Cir. 2013).   Plaintiffs have not met this burden.   There is no

evidence in the record to suggest that Plaintiffs' protected activity was even considered by South Point when their employment was terminated. Accordingly, Plaintiffs' LEWA claims are dismissed.

## CONCLUSION

For the reasons assigned herein, **IT IS ORDERED** that the Motion for Summary Judgment (Record Document 75) filed by South Point, Jack Stahl, Rosemont, and Willoughby be and is hereby **GRANTED** as follows:

Plaintiffs' claims under the Age Discrimination in Employment Act are **DISMISSED WITH PREJUDICE**;

Plaintiffs' claims for breach of duty to provide a safe workplace and ruin of building are **DISMISSED WITHOUT PREJUDICE** to Plaintiffs' ability to file a Workers' Compensation claim;

Plaintiffs' claims pursuant to the Louisiana Environmental Whistleblower Act are **DISMISSED WITH PREJUDICE**.

A judgment consistent with the terms of this Memorandum Ruling shall issue herewith.

**THUS DONE AND SIGNED**, in Shreveport, Louisiana, on this 2nd day of July, 2018.

_____
S. MAURICE HICKS, JR., CHIEF JUDGE
UNITED STATES DISTRICT COURT